**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-cv-22215-ALTMAN/Reid**

**VAUGHN BOYD** and
**SWI-DE, LLC** *d/b/a* **DREW ESTATE**,

   *Plaintiffs*,

*v.*

**DEADWOOD TOBACCO**
**COMPANY**,

   *Defendant.*

_____/

**ORDER**

   In July of 2016, our Defendant, Deadwood Tobacco Company ("DTC"), entered into a licensing agreement with Drew Estate, a cigar manufacturer, to sell a line of premium cigars. A few years later, Vaughn Boyd—the founder of DTC—sold her company to new owners, who, in turn, created their own line of premium cigars. Boyd and Drew Estate have now sued DTC "for federal trademark infringement, federal unfair competition and false designation of origin, and cancellation of Defendant's federal trademark registrations under the Lanham Act, 15 U.S.C. [§] 1051 *et seq.*, and declaratory judgments in connection with allegations of tortious interference with contract and of breach of contract made by Defendant." Complaint [ECF No. 1] at 1. The Defendant responded with a Motion to Dismiss ("Motion") [ECF No. 15] and an accompanying Memorandum of Law ("Memo.") [ECF No. 17].[1] For the reasons we outline below, we now **GRANT** DTC's Motion and **DISMISS** the case.

---

[1] The Motion is ripe for resolution. *See* Plaintiffs' Response to Motion to Dismiss ("Response") [ECF No. 23]; Defendant's Reply in Further Support of Motion to Dismiss ("Reply") [ECF No. 24].

THE FACTS[2]

Boyd, one of our Plaintiffs, founded DTC—a retail store and cigar bar in Deadwood, South Dakota. *See* Complaint ¶ 11. Drew Estate, our other Plaintiff, "is one of the largest premium cigar manufacturers in the world." *Id.* ¶ 7. In 2009, Drew Estate signed a contract with Boyd to "create, make, and sell to DTC a shop-exclusive cigar under the mark DEADWOOD TOBACCO CO. SWEET JANE." *Id.* ¶ 12. In 2013 and 2014, Drew Estate "agreed with Boyd to create, manufacture and sell to DTC two additional shop-exclusive cigars under the marks DEADWOOD TOBACCO CO. FAT BOTTOM BETTY and DEADWOOD TOBACCO CO. CRAZY ALICE." *Id.* ¶ 13. For purposes of this Order, we'll refer to the trademarks for these three shop-exclusive cigars as the "Deadwood Cigar Marks."

Based on enthusiastic consumer response in the local market, "Drew Estate and Boyd agreed that [the Deadwood Cigar Marks] could be successful nationwide if released and sold . . . by Drew Estate throughout the country." *Id.* ¶ 18. So, on July 22, 2016, Drew Estate and DTC (which was, at that time, still owned by Boyd) entered into an Exclusive License Agreement (the "License Agreement"), "under which DTC granted Drew Estate an exclusive worldwide license to . . . the [Deadwood Cigar Marks] [and] the exclusive right to, among other things, make and sell cigars under the [Deadwood Cigar Marks] and other marks incorporating DTC's name, mark, logo, or signature or facsimile thereof." *Id.* ¶ 19; *see also* License Agreement [ECF No. 23-5] at 2–14. That same month, Drew Estate announced its national release of the [Deadwood Cigar Marks] at a trade show, after which an industry publication proclaimed that "Drew Estate is making Deadwood's Three Yummy

---

[2] We take the following facts from the Plaintiffs' Complaint and accept them as true for purposes of this Order. *See Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) ("When ruling on a motion to dismiss, we accept the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." (cleaned up)).

Bitches line a national release. The line includes Sweet Jane, Fat Bottom Betty, and Crazy Alice—previously a shop-exclusive for Deadwood Tobacco Co. in South Dakota." Complaint ¶ 20.

On April 1, 2018, Boyd sold 99% of her interest in DTC to new owners—William and Jolene Rectenwald (the "Rectenwalds")—under a Stock Purchase Agreement (the "Agreement"). *See* Complaint ¶ 26; *see also* Agreement [ECF No. 15-1]. Although DTC (now owned by the Rectenwalds) retained the trademark for "Deadwood Tobacco Co. & Cigar Bar" (the "DTC Mark"), all three of the Deadwood Cigar Marks were "[e]xcluded from that sale" and became Boyd's personal property. Complaint ¶ 26; Agreement at 14–15. That same day, DTC and Boyd executed the "Assignment of Exclusive Trademark License Agreement" (the "Assignment") [ECF No. 15-3] at 2, by which DTC assigned all of its rights, interests, and obligations under the License Agreement to Boyd, *see* Complaint ¶ 27. In 2019, Boyd sold her remaining 1% interest in DTC to the Rectenwalds. *Id.* ¶ 26. On March 1, 2020, DTC and Boyd executed an amendment to their contract, titled "Amendment No. 1 to Assignment of Exclusive Trademark License Agreement" [ECF No. 15-5], in which DTC "acknowledged that [Boyd] as assignee and . . . Drew Estate may continue to expand the scope of marks licensed to . . . Drew Estate." Complaint ¶ 29.

DTC now sells its own line of cigars, *see id.* ¶ 32, which we'll refer to as the "Allegedly Infringing Cigars." According to the Plaintiffs, DTC has been "falsely representing to the public that it was the 'originator' of" the Deadwood Cigar Marks, and that its infringing cigars were just part of a long "lineage of greatness" of "Drew Estate's cigars sold under the [Deadwood Cigar Marks]. *Id.* ¶ 39. According to the Plaintiffs:

> In website searches recently conducted using Google's search engine for the word "Deadwood," Defendant's [sic] DTC's website and store appeared as prominent hits. When accessing Defendant's website, a list of Plaintiff Drew Estate's cigar brands using the [Deadwood Cigar Marks] appeared, but virtually all were noted to be "SOLD OUT." Included in that list on the same page of Defendant DTC's website were Defendant DTC's Chasing the Dragon cigars, interspersed in the middle of Plaintiff Drew Estate's cigar products. By listing these Drew Estate cigars under various [Deadwood Cigar Marks] but not having stocked them for what is, on information and

belief, a substantial time period, and placing Defendant DTC's Chasing the Dragon cigars right next to such out of stock product listings, Defendant DTC is attempting to attract customers to its website using the strong reputation of Plaintiff Drew Estate's brands and [the Deadwood Cigar Marks], but then in a classic "bait and switch," trying to sell customers the infringing DTC Chasing the Dragon cigar products instead.

*Id.* ¶ 44.

On January 27, 2023, Drew Estate sent DTC a letter, claiming that DTC's use of the words "DEADWOOD TOBACCO CO." on the Allegedly Infringing Cigars constituted trademark infringement, and that "misrepresentations that Defendant DTC is the originator of the Drew Estate's Deadwood brand . . . constitute trademark infringement and false statements to the public." *Id.* ¶ 45. Drew Estate requested "that such activity cease to avoid likelihood of confusion and trading on the goodwill of Plaintiff Drew Estate" and demanded "corrective notice to the public." *Ibid.* When DTC did nothing, the Plaintiffs filed this lawsuit, in which they accuse DTC of three Lanham Act violations (Counts 1–3), *see id.* ¶¶ 52, 60, 69; seek a declaration that DTC cannot "bring and maintain a tortious interference claim against Plaintiffs" (Count 4), *id.* ¶ 78; and ask for a declaration that DTC cannot "maintain a breach of contract claim and or [a] breach of implied convent of good faith and fair dealing against Plaintiff" for negotiating contracts that (the Plaintiffs say) lacked consideration (Count 5), *id.* ¶¶ 91–92.

## THE LAW

Under the doctrine of *forum non conveniens* ("FNC"), a district court has "the inherent power to decline to exercise jurisdiction even when venue is proper." *Vanderham v. Brookfield Asset Mgmt., Inc.*, 102 F. Supp. 3d 1315, 1318 (S.D. Fla. 2015) (Moore, C.J.). To show that a case should be dismissed under the doctrine of FNC, "the moving party must demonstrate that (1) an adequate alternative forum is available, (2) the public and private interest factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310–11 (11th Cir. 2001). A district court may dismiss a case

under the doctrine of FNC before resolving questions of personal jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007) ("A district court . . . may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant."); *Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd.*, 722 F. App'x 870, 887 (11th Cir. 2018) (holding that "the district court did not err by addressing the forum-selection clause before deciding the issue of personal jurisdiction").

"The [FNC] calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Atl. Marine Constr. Co. v. U.S. Dist. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2012) (cleaned up). The presence of a valid forum-selection clause requires district courts to adjust their FNC analysis in three ways: *First*, "the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Ibid. Second*, because "the private-interest factors . . . weigh entirely in favor of the preselected forum[,] . . . a district court may consider arguments about public-interest factors only." *Id.* at 64. *Third*, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Ibid.* In sum, "[w]here there is a valid and enforceable forum-selection clause[,] courts apply a modified *forum non conveniens* analysis and assess (1) whether an adequate alternative forum is available, (2) whether the public factors weigh in favor of dismissal, and (3) whether the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Turner v. Costa Crociere S.p.A.*, 488 F. Supp. 3d 1240, 1252–53 (S.D. Fla. 2020) (Moore, C.J.) (citing *Atl. Marine*, 571 U.S. at 63–65) ("Turner says that the district court abused its discretion by refusing to defer to his chosen forum and

by deeming the private interest factors to weigh in favor of the Italian forum. But because of the valid forum selection clause, each of these steps was consistent with—indeed, required by—the modified approach set forth in *Atlantic Marine*."), *aff'd*, 9 F.4th 1341, 1348 (11th Cir. 2021).

## ANALYSIS

DTC asks us to dismiss the Plaintiffs' Complaint because it "fails to plead facts sufficient to establish a case for jurisdiction over [DTC]" and because the "parties to this suit have signed forum selection clauses, setting jurisdiction in the circuit court for Lawrence County, South Dakota[.]" Memo. at 1–2. DTC says that we lack personal jurisdiction over it because it's a "South Dakota corporation" owned by South Dakota residents with "no routine business contacts" or "substantial sales" in Florida. Motion at 1, 3. DTC also contends that "the parties have contracted for forum selection clauses in South Dakota, which are mandatory and enforceable," so this action should be dismissed under the doctrine of FNC. *Id.* at 3. After careful review, we agree with DTC that the doctrine of FNC compels us to dismiss this case. We thus do not reach DTC's jurisdictional arguments.

DTC's FNC argument turns on the parties' Agreement and Assignment—both of which Boyd and the Rectenwalds executed on April 1, 2018. According to DTC, the Agreement sold "everything that Deadwood Tobacco Co. owned, including all business and intangible assets, *with the exception* of the [Deadwood Cigar Marks]," to the Rectenwalds. Memo. at 7 (emphasis added). The Agreement includes the following venue-selection clause:

> Venue for any dispute arising out of this Agreement shall be Lawrence County, South Dakota, and the circuit court in Lawrence County, South Dakota shall have jurisdiction over the parties and subject matter of the dispute.

Agreement at 11.[3] The Assignment, meanwhile, "purported to assign all rights of Deadwood Tobacco Co. in the [Deadwood Cigar Marks] from Deadwood Tobacco Co. to Vaughn Boyd." Memo. at 9. The Assignment includes the following choice-of-law provision:

> The Assignment is governed by the laws of the state of South Dakota, without regard to South Dakota's conflict or choice of law provisions, and both parties expressly consent to jurisdiction in such courts.

Assignment at 2.

DTC maintains that these provisions are "mandatory selection clause[s] [that] require[ ] this case be dismissed pursuant to the doctrine of *forum non conveniens*." Memo. at 10. The Plaintiffs insist that *neither* the Agreement *nor* the Assignment includes a forum-selection clause that's relevant to our case. In their view, the Agreement's forum-selection clause has nothing to do with this case because "none of the causes of action in the complaint arise from the [Agreement]" and because "the trademark rights that Plaintiff Drew Estate is asserting in this case also do not arise from the [Agreement]." Response at 14–15. The Plaintiffs also contend that the Assignment doesn't have a forum-selection clause *at all. See id.* at 15 ("Notably, there is no forum selection clause in the [Assignment] that requires this action to be brought in South Dakota."). The Plaintiffs thus conclude that, after we conduct a full FNC analysis, we'll agree that DTC "has failed to establish that private and public factors strongly favor Defendant and that, therefore, a change of venue is necessary." *Id.* at 16. After carefully reviewing the parties' arguments and the governing law, we conclude that (1) the

---

[3] Both the Plaintiffs and DTC attach exhibits to their briefing. *See generally* Motion; Response. Under the incorporation-by-reference doctrine, we may consider these documents without converting the motion to dismiss into a motion for summary judgment if they are "(1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). We also have the discretion to "consider matters outside the pleadings, and often must do so," when considering an FNC defense. *Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1320 (S.D. Fla. 2000) (Gold, J.) (citing *Transmirra Prods. Corp. v. Fourco Glass Co.*, 246 F.2d 538–39 (2d Cir. 1957)). Since the parties don't dispute the exhibits' authenticity—and because the exhibits are central to our FNC analysis—we'll consider them without converting the motion to dismiss into a motion for summary judgment.

Agreement and the Assignment include mandatory forum-selection clauses that govern the Plaintiffs'

claims; and (2) when considering those mandatory forum-selection clauses, we must dismiss this case

under the doctrine of FNC.

### I.     The Forum-Selection Clauses Relate to This Case

We'll start, as we must, by establishing the boundaries of the relevant forum-selection clauses.

In construing a forum-selection clause, courts look to "the plain meaning of a contract's language[.]"

*Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011). A legal claim will "relate" to

a contract (and the applicable forum-selection clause) "when the dispute occurs as a fairly direct result

of the performance of contractual duties." *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1317 (11th Cir.

2013) (cleaned up); *see also Bah. Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340 (11th Cir. 2012) ("To

determine if a claim falls within the scope of a clause, we look to the language of the clause."). The

Eleventh Circuit has pointed out that a "dispute [that] could not have arisen but for an agreement

does not mean that the dispute necessarily 'relates to' that agreement." *Bailey*, 705 F.3d at 1317–18. In

other words, for the forum-selection clause to apply, there must still be a "direct relationship between

the claim and the contract[.]" *Ibid.*

Our analysis begins in late 2014, when the U.S. Patent and Trademark Office ("USPTO")

issued the three Deadwood Cigar Marks to the registrant, "Deadwood Tobacco Company (South

Dakota Corporation)." Deadwood Cigar Marks [ECF Nos. 1-1, 1-2, 1-3]. On July 22, 2016, DTC

(which was still owned by Boyd) entered into the License Agreement with Drew Estate. That License

Agreement gave Drew Estate "the exclusive right and license to use [the Deadwood Cigar Marks] on

[premium handmade cigars] throughout the world," while reaffirming that DTC was still "the sole and

exclusive owner of all rights in the Marks[.]" License Agreement [ECF No. 23-5] at 2. So far, this story

is easy to follow: DTC, with Boyd at its helm, registered and owned the Deadwood Cigar Marks and

then granted Drew Estate the exclusive license to sell and market cigars that used the Deadwood Cigar Marks.

On April 1, 2018, Boyd decided to sell "ninety nine percent (99%) of the issued and outstanding common capital stock of [DTC]" to the Rectenwalds. Agreement at 1. The Agreement made clear that DTC continued to hold "all right, title and interest in and to the inventory of the Company[.]" *Id.* at 2. That inventory was set out in an attachment ("Exhibit A") and included the DTC Mark. *Id.* at 14. At the same time, the Agreement recognized that Boyd would "retain the items set out in Exhibit B," which included (among other things) the Deadwood Cigar Marks and "[a]ll licensing and royalty payments from [Drew Estate] relating to [the Deadwood Cigar Marks]." *Id.* at 6, 15. The Agreement mandated that "any dispute arising out of this Agreement *shall* be in Lawrence County, South Dakota, and the circuit court in Lawrence County, South Dakota shall have jurisdiction over the parties and subject matter of the dispute." *Id.* at 11 (emphasis added). With control of DTC now firmly transferred from Boyd to the Rectenwalds, DTC then "assign[ed] all [DTC's] right, title, and interest, and delegate all its obligations, responsibilities, and duties, in and to the [License Agreement], to [Boyd]." Assignment at 1. The Assignment also provided that "both parties *expressly consent to jurisdiction*" in South Dakota. *Id.* at 2 (emphasis added).

Having reviewed the language of the Agreement and the Assignment, we must now answer two dispositive questions: (1) What's the scope of these forum-selection clauses? and (2) Does this action "relate" to *either* the Agreement *or* the Assignment? A forum-selection clause is either permissive or mandatory. "A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere. A mandatory clause, in contrast, dictates an exclusive forum for litigation under the contract." *Glob. Satellite Commc'n Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1272 (11th Cir. 2004) (cleaned up). If we find that a mandatory and enforceable forum-selection clause governs the Plaintiffs' claims, then we must apply the modified FNC analysis the Supreme Court outlined in

*Atlantic Marine. See Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.*, 2023 WL 4457458, at * 8 (S.D. Fla. July 11, 2023) (Scola, J.) ("Because the Court finds that the forum-selection clause is valid and enforceable as to both the Bolder Defendants, the modified analysis in *Atlantic Marine* applies."); *see also Anderson v. First Mercury Ins. Co.*, 2020 WL 3316917, at *3 (M.D. Fla. Feb. 28, 2020) (Byron, J.) ("However, *Atlantic Marine* dealt with a mandatory forum selection clause. In contrast, the forum selection clause at issue here is permissive, so Plaintiff did not violate it by filing his lawsuit in this Court. Accordingly, Defendant's reliance on *Atlantic Marine* is misplaced." (cleaned up)).

The Agreement's forum-selection clause is plainly mandatory. It says that venue and jurisdiction "for any dispute arising out of this Agreement *shall* be in Lawrence County, South Dakota[.]" Agreement at 11 (emphasis added). And the Eleventh Circuit has been clear that, when a forum-selection clause uses the term "shall," it's a mandatory clause. *See Slater*, 634 F.3d at 1330 ("Based on a plain reading of the clause, we conclude that the forum designation in the clause is not permissive, but mandatory. As we have recognized, the use of the term 'shall' is one of requirement." (citing *Glob. Satellite*, 378 F.3d at 1272)). That's really the end of that.

The Assignment's clause is less straightforward. In the Plaintiffs' view, in fact, it includes no forum-selection clause at all. *See* Response at 15 ("Notably, there is no forum selection clause in the [Assignment] between DTC and Ms. Boyd that requires this action to be brought in South Dakota."). Still, we think the Assignment likewise includes a mandatory forum-selection clause—even though it doesn't come with the word "shall." The Assignment (it's true) doesn't explicitly designate a preferred forum. It simply says that it will be "governed by the laws of the state of South Dakota" and that "both parties expressly consent to jurisdiction in such courts." Assignment at 2. In a vacuum, we'd agree that this sounds a lot like a *permissive* forum-selection clause because it seems only to "authorize" jurisdiction in South Dakota—without "prohibit[ing] litigation elsewhere." *Glob. Satellite*, 378 F.3d at 1272. But the Eleventh Circuit rejected this very argument in *Florida Polk County v. Prison Health Services,*

*Inc.*, 170 F.3d 1081 (11th Cir. 1999). The forum-selection clause in that case provided that "jurisdiction regarding the rights and obligations of either party under this Agreement and all litigation resulting therefrom [is] in the circuit court of Polk County, Florida." *Id.* at 1083 (cleaned up). Even though the clause lacked "mandatory" language, the Eleventh Circuit found that it represented a *mandatory* forum-selection clause because, with or without the clause, "the circuit court of Polk County" *already* had jurisdiction over the contract "[u]nder Florida's venue statute[.]" *Id.* at 1083–84. In other words, the plaintiffs' construction "would render [the forum-selection clause] surplusage, because the circuit court of Polk County . . . already had the authority to entertain any controversy arising out of the contract." *Id.* at 1084; *accord Cardoso v. Coelho*, 596 F. App'x 884, 886 (11th Cir. 2015) ("In *Polk County*, jurisdiction was already clearly established in the forum referenced in the selection clause. Because the clause was not necessary to create jurisdiction, a permissive reading would have rendered the clause meaningless.").

That's exactly the situation we have here. Under South Dakota law, a party may consent to personal jurisdiction by executing an agreement with a valid forum-selection clause. *See O'Neill Farms, Inc. v. Reinert*, 780 N.W. 2d 55, 62 (S.D. 2010) ("[By agreeing to a forum-selection clause] Reinert is deemed to have consented to personal jurisdiction or waived the requirements for personal jurisdiction in South Dakota."). But our Assignment was between DTC (a South Dakota corporation located in Deadwood, South Dakota) and Boyd (a South Dakota resident residing in Whitewood, South Dakota). *See* Assignment at 1. The courts of South Dakota (it goes without saying) would *already have* jurisdiction over any cause of action concerning the Assignment—with or without a forum-selection clause. *See* S.D. CODIFIED LAWS § 15-5-5 ("Actions on contracts . . . shall be brought and tried in the county where the indemnified resides at the time said action is commenced; or in the

county where such liability or loss indemnified by such contract or bond occurred.").[4] Since the parties didn't need a forum-selection clause to establish that South Dakota's courts could exercise personal jurisdiction over any dispute arising from the Assignment, the Plaintiffs' reading of that clause as adding nothing at all would render the clause pure surplusage—something the Eleventh Circuit has admonished us not to do. Fortunately, we can avoid this problem—as the Eleventh Circuit did in *Polk County*—by construing this part of the Assignment as *requiring* the parties to file any suit relating to the Assignment in South Dakota. *See Polk Cnty.*, 170 F.3d at 1084 ("To read the forum-selection clause as permissive would render it surplusage, because the circuit court of Polk County—for the reasons stated above—already had the authority to entertain any controversy arising out of the contract. To read the clause as mandatory—thus requiring all litigation arising out of the contract to take place in the circuit court of Polk County—gives the provision meaning.").[5]

Having found that *both* the Agreement *and* the Assignment include enforceable forum-selection clauses, we must now determine whether those clauses apply to our case.[6] As we've said, for

---

[4] Unlike the Agreement, the Assignment doesn't identify a *specific* South Dakota court. *Compare* Agreement at 11 ("Venue for any dispute arising out of this Agreement shall be in Lawrence County, South Dakota, and the circuit court in Lawrence County, South Dakota shall have jurisdiction over the parties and subject matter of the dispute."), *with* Assignment at 2 ("This Assignment is governed by the laws of the state of South Dakota . . . and both parties expressly consent to jurisdiction in such courts."); *see also Glob. Satellite*, 378 F.3d at 1273–74 (recognizing that a venue-selection clause designating "Broward County, Florida" could refer to "federal district court" in Broward County *or* "the state courts of Florida located in Broward County"). But that distinction is of no moment here— and the Plaintiffs never suggest that it is.

[5] Both the Assignment and the contract in *Polk County* have choice-of-law provisions that are consistent with their forum-selection clauses. *Compare* Assignment at 2 ("This Assignment is governed by the laws of the state of South Dakota . . . and both parties expressly consent to jurisdiction in such courts."), *with Polk Cnty.*, 170 F.3d at 1083 n.4 ("The provision further stated that 'all rights and obligations of the parties hereto shall be governed both procedurally and substantively by and construed according to the Laws of the State of Florida.'"). These striking similarities between the Assignment and the *Polk County* contract emphasize just how much the Plaintiffs' interpretation unacceptably limits the scope of the Assignment's forum-selection clause.

[6] "Forum-selection clauses are presumptively valid and enforceable unless the plaintiff makes a 'strong showing' that enforcement would be unfair or unreasonable under the circumstances." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009). The Plaintiffs never suggest that the

the clauses to apply, the Plaintiffs' claims must "relate[ ] to" the Agreement or the Assignment. *Byers*, 701 F.3d at 1340. Fortunately, both forum selection-clauses, by their own terms, apply to *any* legal challenges involving the Agreement or the Assignment. *See* Agreement at 11 ("Venue for *any* dispute arising out of this Agreement shall be in Lawrence County, South Dakota[.]" (emphasis added)); Assignment at 2 ("This Assignment is governed by the laws of the state of South Dakota . . . both parties expressly consent to jurisdiction in such courts."). So, if we determine that the Plaintiffs' claims relate to the Agreement or the Assignment, then the forum-selection clauses in those contracts would govern those claims.

The Plaintiffs insist that their claims only implicate the July 22, 2016 License Agreement between DTC and Drew Estate—and that, as such, the Agreement and the Assignment's forum-selection clauses aren't relevant here. *See* Response at 15 ("Similarly, the trademark rights that Plaintiff Drew Estate is asserting in this case also do not arise from the [Agreement]. Rather, there is a separate Exclusive License Agreement granting Drew Estate exclusive trademark rights and the right to sue for infringement."). But this contention—advanced in response to the Defendant's FNC arguments— is belied by the Plaintiffs' *own Complaint*, which alleges (1) that the Agreement, the Assignment, *and* the License Agreement, "*read together*[,] establish that Plaintiff Boyd has the exclusive right to license the [Deadwood Cigar Marks]," Complaint ¶ 95 (emphasis added), and (2) that DTC "is disregarding the terms of *these contracts* in an effort to invalidate Plaintiffs Boyd and Drew Estate's contractual rights,"

---

forum-selection clauses in the Agreement and the Assignment are in any way unenforceable or invalid, *see generally* Response, so they've forfeited any such argument, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

*id.* ¶ 99 (emphasis added). The Plaintiffs also ask us—in Counts IV and V of the Complaint—to declare invalid DTC's positions that (1) "it has a right to the use of the [Deadwood Cigar Marks]," (2) "the *various contracts* are unenforceable," and (3) the Plaintiffs "have breached *various contracts* and/or breached an implied duty of good faith and fair dealing because . . . the *contracts* in question lacked consideration." *Id.* ¶¶ 77, 92 (emphases added). In short, this lawsuit is all about DTC's allegedly unsanctioned use of the Deadwood Cigar Marks (in violation of the terms of the Agreement and the Assignment), the enforceability of the contracts (including the Agreement and the Assignment), and, relatedly, DTC's claim that the Plaintiffs breached *these contracts* before DTC infringed. Since the terms of the Agreement and the Assignment are thus central to the Plaintiffs' claims against DTC—and to DTC's defenses—their forum-selection clauses plainly apply here. *See Byers*, 701 F.3d at 1340–41 ("A claim relates to a contract when the dispute occurs as a fairly direct result of the performance of contractual duties." (cleaned up)); *see also, e.g.*, *Thompson v. Caliber Home Loans, Inc.*, 2016 WL 278731, at *3 (S.D. Fla. Jan. 22, 2016) (Gayles, J.) ("Thompson's only relationship to Vericrest is through the Mortgage, and the dispute that gave rise to her claims has its genesis in Vericrest's attempts (through Caliber) to collect a debt from her as a result of her nonperformance of contractual duties established by the Mortgage.").

And it doesn't much matter for our purposes that Drew Estate wasn't a signatory to *either* the Agreement *or* the Assignment. "[I]n order to bind a non-party to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound." *Cooper v. Meridian Yachts*, 575 F.3d 1151, 1180 (11th Cir. 2009) (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998)). "[N]on-signing parties [are] bound by the choice of law and choice of forum clauses where the parties' rights [are] completely derivative of those signing parties— and thus directly related to, if not predicated upon the interests of the signing parties." *Ibid.* (cleaned up & quoting *Lipcon*, 148 F.3d at 1299); *see also Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d

714, 722 (2d Cir. 2013) ("The enforceability of forum selection clauses as to non-signatories need not

be limited to successors in interest. . . . [W]here the alleged conduct of the nonparties is closely related

to the contractual relationship, a range of transaction participants, parties and nonparties, should

benefit from and be subject to forum selection clauses." (cleaned up)); *EWT Holdings, Corp. v. Progressive*

*Glob. Tech. Inc.*, 2006 WL 8433634, at *7 (S.D. Fla. May 26, 2006) (Torres, Mag. J.) ("A range of

transaction participants, parties and non-parties, should benefit from and be subject to forum selection

clauses. Several district courts, including the Southern District of Florida, have ruled that the

transaction participants, even if non-parties to the contract, benefit from, and are subject to a forum

selection clause." (cleaned up)).

And that's certainly true of Drew Estate here. Although Boyd and DTC were the only parties

to the Agreement and the Assignment, those documents govern Drew Estate's rights to the

Deadwood Cigar Marks—"such that it [should've been] foreseeable that [Drew Estate] [would] be

bound." *Cooper*, 575 F.3d at 1180. Indeed, Drew Estate's claims in this case are "completely derivative

of those signing parties—and thus directly related to, if not predicated upon the interests of the signing

parties," *ibid.* (cleaned up) (quoting *Lipcon*, 148 F.3d at 1299)—because, without the Agreement and

the Assignment, DTC would've retained its licensing rights over the Deadwood Cigar Marks. In that

scenario, it isn't at all clear that Drew Estate would've held any right to sue DTC (the marks' licensor)

for infringement—especially because DTC (as licensor) might've retained some right, absent the

Agreement and Assignment, to *withdraw* or otherwise curtail Drew Estate's license to use the marks.

Plus, as we've seen, Drew Estate relies on the terms of the Agreement *and* the Assignment in asserting

its claims in Counts IV and V. *See, e.g.*, Complaint ¶¶ 77, 92, 95, 99. Drew Estate thus cannot now

disavow the centrality of those contracts to the interests it seeks to vindicate through this litigation.

We therefore conclude that Drew Estate is bound by the forum-selection clauses in the Agreement

and the Assignment because Drew Estate is "'closely related' to the dispute[.]" *Lipcon*, 148 F.3d at 1299 (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)).

And, having made that determination, we must presume that the courts of South Dakota are the better (and more convenient) forum for the Plaintiffs' claims. *See Atl. Marine*, 571 U.S. at 63 ("[A] valid forum-selection clause should be given controlling weight in all but the most exceptional cases." (cleaned up)); *Oribe Hair Care, LLC v. Canales*, 2017 WL 2059582, at *4 (S.D. Fla. May 15, 2017) (Gayles, J.) ("[A] valid forum-selection clause almost always governs[.]"); *HNA LH OD, LLC v. Local House Int'l, Inc.*, 2021 WL 4459404, at *9 (S.D. Fla. Sept. 21, 2021) (Bloom, J.) ("The Supreme Court has held that the existence of a forum-selection clause is essentially dispositive in the *forum non conveniens* analysis.").

## II.    The Modified FNC Analysis Mandates Dismissal Here

But that's not the end of our inquiry. As we've said, the presence of a valid forum-selection clause requires us to adjust our FNC analysis in three ways: *First*, "the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine*, 571 U.S. at 63. *Second*, because "the private-interest factors . . . weigh entirely in favor of the preselected forum[,] . . . a district court may consider arguments about public-interest factors only." *Id.* at 64. *Third*, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." In sum, having found that a valid forum-selection clause governs the Plaintiffs' claims, we must now "apply a modified *forum non conveniens* analysis and assess (1) whether an adequate alternative forum is available, (2) whether the public factors weigh in favor of dismissal, and (3) whether the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Turner*, 488 F. Supp. 3d

at 1252–53 (citing *Atl. Marine*, 571 U.S. at 63–65), *aff'd*, 9 F.4th at 1348 ("Turner says that the district court abused its discretion by refusing to defer to his chosen forum and by deeming the private interest factors to weigh in favor of the Italian forum. But because of the valid forum selection clause, each of these steps was consistent with—indeed, required by—the modified approach set forth in *Atlantic Marine*."). These three modified factors weigh heavily in DTC's favor.

  *First*, South Dakota is an adequate alternative forum for this dispute. A forum is available and adequate if "the defendant is amenable to process in the other jurisdiction" and if the forum "provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries." *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009). South Dakota is an adequate and available forum because it "possesse[s] jurisdiction over the entire case, including all of the parties"— and because South Dakota's federal courts can provide the Plaintiffs with precisely the same relief that's available here. *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1290 (11th Cir. 2009); *see also Todd Benjamin Int'l*, 2023 WL 4457458, at *8 ("Here, the Bolder defendants consented to jurisdiction in the Cayman Islands, an adequate alternative forum with the ability to provide relief for the Plaintiffs."). The Plaintiffs (notably) never suggest that South Dakota is anything but an adequate alternative forum. *See generally* Response. They've thus forfeited any such argument here. *See Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Sappupo*, 739 F.3d at 681; *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited]."). Forfeiture aside, though, the Plaintiffs have "not made a sufficient showing" that litigating in South Dakota "would preclude the fair and reasonably expeditious adjudication of the . . . issues presented by the pending case." *Leon*, 251 F.3d at 1314. The first factor thus favors dismissal.

*Second*, the public-interest factors overwhelmingly favor dismissal. These factors include "[(1)] the administrative difficulties flowing from court congestion; [(2)] the local interest in having localized controversies decided at home; [(3)] the interest in having the trial . . . in a forum that is at home with the law that must govern the action; [(4)] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [(5)] the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981) (cleaned up & citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)). Although we generally must "consider all *relevant* public factors, not *all* public factors" in our FNC analysis, *Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1051 (11th Cir. 2019),[7] we'll address each of these five factors in turn.

*One*, "the Southern District of Florida has one of the busiest dockets in the country," *Gordon v. Sandal Resorts Int'l, Ltd.*, 418 F. Supp. 3d 1132, 1142 (S.D. Fla. 2019) (Scola, J.), so the first (or court-congestion) factor leans in favor of dismissal. That said, this factor "generally does not warrant significant consideration in the [FNC] analysis," especially since we have no comparative evidence regarding docket congestion in the circuit court for Lawrence County, South Dakota, so we won't "accord [this factor] much weight." *Ibid.* (citing *Morse v. Sun Int'l Hotels Ltd.*, 2001 WL 34874967, at *6 (S.D. Fla. Feb. 26, 2001) (Jordan, J.)).

*Two*, this dispute mostly concerns local interests in South Dakota. Two of the three parties—the Defendant and one of the two Plaintiffs—are South Dakota citizens. *See* Complaint ¶¶ 1, 3 ("Plaintiff Boyd is an individual and citizen of South Dakota . . . . Defendant DTC is a corporation existing under the laws of the State of South Dakota[.]"). DTC, in particular, has a physical presence in South Dakota as a "retail store and cigar bar in Deadwood, South Dakota." *Id.* ¶ 11. The Agreement and the Assignment were both executed by South Dakota citizens in South Dakota. *See* Agreement at

---

[7] *See also Turner*, 9 F.4th at 1348 ("[D]istrict courts are not required to consider all of the public factors, they may choose to discuss only those that are relevant.").

18–19 (indicating that the Agreement was executed in Lawrence County, South Dakota).[8] Although Drew Estate is based in Florida, it's really an international company, founded in New York City, that owns and operates "the largest premium cigar factory in Nicaragua" and organizes and runs events in Florida, Pennsylvania, Connecticut, Louisiana, Texas, and Kentucky. Complaint ¶¶ 7–8. Our local interests in this District are therefore much weaker than South Dakota's. *Cf. Lisa, S.A. v. Gutierrez Mayorga*, 441 F. Supp. 2d 1233, 1240–41 (S.D. Fla. 2006) (Moore, J.) ("[T]he fraud occurred in Guatemala, the conduct causing the injury occurred in Guatemala, the domicile, residence, nationality, place of incorporation and place of business of nearly all of the parties is Guatemala, and the place where the relationship between the parties is centered is Guatemala . . . . The Court finds that Guatemala is a far more appropriate forum for all of the aforementioned reasons."). This second factor therefore favors dismissal.

*Three*, our parties agree that, where federal trademark law doesn't apply, South Dakota law will govern this action. For example, South Dakota law will be essential in interpreting the terms of both the Agreement and the Assignment. One of DTC's putative defenses is that the Assignment is invalid under South Dakota law because the Rectenwalds didn't receive "adequate consideration." *See* Response at 17 ("Therefore, DTC cannot now claim lack of consideration." (citing *Furst v. Risse*, 229 N.W. 293, 294 (S.D. 1930))); Reply at 5 ("Since nothing was transferred in the [Assignment], it is not even an enforceable contract under South Dakota law." (citing *Meyer v. S.D. Dep't of Soc. Servs.*, 581 N.W.2d 151, 155 (S.D. 1998))). "Without question, it would be more appropriate for [South Dakota's] courts to decide these issues of local law than for this Court to do so." *Montgomery v. Oberti*, 945 F. Supp. 2d 1367, 1378 (S.D. Fla. 2013) (Cohn, J.). Although trademark disputes often have national

---

[8] It's not clear where the Assignment was executed. But, given that the Agreement and the Assignment were executed on the same day by the same parties, it seems very likely that the Assignment was also signed in Lawrence County, South Dakota.

implications—and while they mostly rely on federal law—South Dakota's courts will also have jurisdiction over questions of federal trademark law. *See Dunlap v. G&L Holding Grp., Inc.*, 381 F.3d 1285, 1292 n.11 (11th Cir. 2004) ("State and federal courts are expressly given concurrent jurisdiction over claims involving infringement of a federally registered trademark."). This factor thus likewise favors dismissal.

*Four*, and for similar reasons, the conflict-of-laws factor favors dismissal because South Dakota law will govern (at least part of) this case and because South Dakota's courts are better equipped to interpret and apply their own laws. *See, e.g., McLane v. Marriott Int'l, Inc.*, 960 F. Supp. 2d 1351, 1362 (S.D. Fla. 2013) (Lenard, J.) ("Costa Rican law likely would govern this action. Consequently, [the conflict of laws] factor weighs in favor of Costa Rica as the proper forum.").

*Five*, a jury in our District would seem to have very little interest in this litigation, which concerns alleged trademark infringement by a South Dakota corporation on a mark that's owned by a South Dakota woman. The only specific connection between this case and our District is that South Florida is the headquarters of the marks' licensee—who, as we've said, has more of an international (rather than a strictly Florida-based) presence. *See Rivas ex rel. Estate of Gutierrez v. Ford Motor Co.*, 2004 WL 1247018, *14 (M.D. Fla. Apr. 19, 2004) (Kovachevich, J.) (explaining that a claim involving a local party "with extensive foreign dealings . . . could be reasonably inferred to be of 'mere passing interest' to local jurors" (quoting *Kamel v. Hill-Rom Co.,, Inc.*, 108 F.3d 799, 804–05 (7th Cir. 1997))). Moreover, even if local jurors had some interest in the outcome of this case, a South Dakota jury would be much more invested in a case that involves mostly South Dakotan interests. *See Ciuffardi v. Xerox Corp.*, 2010 WL 11553683, at *2 (S.D. Fla. Dec. 10, 2010) (Graham, J.) ("Indeed, trying this case in Florida would subject Florida residents to serving on a jury in a case which has little . . . ties to this area, but significant ties to [the foreign jurisdiction].").

The five public-interest factors thus support DTC's request for FNC dismissal.

*Finally*, litigating this case in South Dakota won't prejudice the Plaintiffs. After all, one of the Plaintiffs (Boyd) consented to jurisdiction in South Dakota. *See Leon*, 251 F.3d at 1310 ("[I]t would be possible to reinstate the case in Ecuador, since all defendants had agreed to jurisdiction and service of process."); *Todd Benjamin Int'l*, 2023 WL 4457458, at *9 ("Finally, the Court concludes that dismissal is appropriate because the Plaintiffs can reinstate their lawsuit in the Cayman Islands without undue inconvenience or prejudice. The Bolder Defendants have specifically consented to Cayman Islands jurisdiction [in their forum-selection clause]." (cleaned up)). And, as we've said, Drew Estate is bound by those forum-selection clauses because of its close relationship to the dispute and because its right to sue DTC derives from the concessions DTC made in the Agreement and the Assignment. *See Cooper*, 575 F.3d at 1170 ("[N]on-signing parties were bound by the choice of law and choice of forum clauses where the parties' rights were completely derivative of those of the signing parties—and thus directly related to, if not predicated upon the interests of the signing parties." (cleaned up)).

*      *      *

Boyd and DTC entered into two valid, enforceable, and mandatory forum-selection clauses—both of which designated South Dakota as the exclusive venue for this dispute. South Dakota is an adequate alternative forum, the public-interest factors favor dismissal, and the Plaintiffs will not be prejudiced if they have to refile this action in South Dakota. Accordingly, in accordance with the modified FNC framework the Supreme Court set out in *Atlantic Marine*, we now **GRANT** DTC's Motion to Dismiss.

## CONCLUSION

After careful review, we hereby **ORDER and ADJUDGE** that Deadwood Tobacco Company's Motion to Dismiss [ECF No. 15] is **GRANTED**. The case is **DISMISSED** under the

doctrine of FNC.[9] All other pending motions are **DENIED as moot**. The Clerk shall **LIFT** the stay.

The case will remain **CLOSED**.

       **DONE AND ORDERED** in the Southern District of Florida on March 4, 2024.

ROY K. ALTMAN
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[9] "The effect is that dismissal for inconvenience will function in a fashion similar to dismissals without prejudice." *Sigalas v. Lido Mar., Inc.*, 776 F.2d 1512, 1516 (11th Cir. 1985); *see also Chazen v. Deloitte & Touche, LLP*, 2003 WL 24892029, at *3 (11th Cir. Dec. 12, 2003) ("A *forum non conveniens* dismissal is a refusal to exercise jurisdiction, and should not be followed by an adjudication of defenses asserted. We conclude that the district court abused its discretion by adjudicating the defenses and dismissing Chazen's claims with prejudice.").